```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

            -v.-                :      15 Cr. 101 (KBF)

JAMES CONLEY,                   :

        Defendant.              :

- - - - - - - - - - - - - - - - x
```

**GOVERNMENT'S SENTENCING MEMORANDUM**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

Janis M. Echenberg
Jennifer L. Beidel
Assistant United States Attorneys
    – Of Counsel –

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA       :

            -v.-               :    15 Cr. 101 (KBF)

JAMES CONLEY,                  :

       Defendant.              :

- - - - - - - - - - - - - - - -x
```

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government, by and through the attorneys below, respectfully submits this memorandum in connection with the sentencing of defendant James Conley ("Conley" or the "defendant"), which is scheduled for March 9, 2016 at 1:00 p.m., and in response to the defendant's sentencing letter dated December 28, 2015 ("Def. Ltr."), in which the defendant asks the Court to impose a sentence of thirty-six months for his participation in this fraudulent business opportunity scheme. (Def. Ltr. at 12). The parties and the United States Probation Office agree that the Guidelines range applicable to the defendant's conduct is 51 to 63 months' imprisonment. (Presentence Report dated December 18, 2015 ("PSR") ¶ 5). Ultimately, Probation recommends a sentence at the high-end of the Guidelines range of 60 months' imprisonment and three years of supervised release. (PSR at 25). For the reasons set forth below, the Government respectfully requests that the Court

impose a sentence within the applicable Guidelines range of 51 to 63 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## Background

I.  **The Offense Conduct**

The defendant was charged along with six co-conspirators with participating in a massive consumer fraud scheme that collected approximately $11 million dollars[1] and involved more than 1,300 consumers between 2005 and 2011.  (PSR ¶ 11).  The consumers they defrauded, who they reached throughout the United States and Canada by phone, email, and regular mail, spent hundreds and often thousands of dollars – a life savings to some – to purchase what the consumers believed were lucrative vending machine "business opportunities" that included the placement of modern vending machines in pre-determined, profitable locations.  In fact, what the consumers received – at their homes or at loading docks, rather than in the pre-determined locations to which they expected the machines to be delivered – were cheaply-made, mostly mechanical vending

---

[1] Although the indictment reflects that the company collected nearly $9 million during the charged timeframe (PSR ¶ 11), in preparation for trial against the remaining defendants, the Government continued to review financial records, which reflect customer payments of approximately $11 million during the charged time period.

2

machines that were hard to place and ultimately netted little to no profit.

The scheme was run by Kenneth Levin ("K. Levin"), who owned and operated a vending machine sales business that functioned under a variety of corporate names, at least five during the charged time period, most recently United Marketing. Part of the fraudulent scheme involved K. Levin changing the company name frequently to avoid having to disclose to potential customers the names and contact information of recently defrauded customers and to limit the impact of online complaints.

Conley worked at United Marketing from in or about 2005 through November 2011, during which time he was telemarketing salesperson. (PSR ¶ 16). In that capacity, Conley, like many others in the sales force, conveyed to potential customers that there were pre-established routes available with high-income producing locations ready for the vending machines. (PSR ¶ 24).

Conley's sales tactics were so unscrupulous that they played a prominent role in the trial against his co-defendants. As illustrated by Conley's handwritten notes, by many undercover recordings, and by victim testimony, Conley routinely told victims that they could expect to earn $250 to $300 per week per machine that they bought from him, when he knew that, in fact,

none of his customers were making a profit.  Tr_1626, 3087; Gov. Exh. 1H, 7C.[2]

Conley also lied about locations.  He sold five machine and ten machine routes in specific locations, saying things like there were ten locations available in Charlottesville, Virginia and five locations available in Staunton, Virginia, when there were no locations anywhere and certainly not in those specific areas.  Tr_3087.  And Conley doubled down on this locations lie by attempting to resell victims using "master dealer agreements," which told victims that they would be the exclusive vendors in their areas, when he knew that was a lie.  TR_2461.  To make matters worse, Conley knew that the locators which whom he worked were the "fucking worst," but yet he continued to recommend them to victims.  Gov. Exh. 2C; Tr_3159.  Conley even requested kickbacks for the referrals from one such locator, Jay Baird.  Tr_916.

Conley also lied about a variety of other topics, essentially saying whatever was necessary to make a sale.  He said the machines were high-quality and state-of-the-art, when they could not have been further from it.  Tr_3087.  He told victims that United Marketing manufactured the machines, when he knew they did not.  Gov. Exh. 1B.  He said he owned his own

---

[2] The references to transcripts and Government exhibits contained herein are to the trial against K. Levin and Taylor Levin.

vending machines, when he did not.  Tr_3088.  He told victims that he was the Director of Business Development for all of North America, when he knew that was untrue.  Gov. Exh. 11ZH.  And, after laying out this panoply of lies, Conley created urgency by telling the victims that he had had many previous callers for the limited number of routes available in their areas, when none of that was true.  Gov. Exh. 2H.

Perhaps most tellingly, Conley talked openly, and in a manner that can only be described as braggadocio, to a potential new hire for K. Levin's company, whom he had only known for a matter of days, about his criminal past and his prior theft of millions of dollars.  Gov. Exh. 2N, 7A, 7B.  Conley went on to explain that, as compared to his prior frauds, the vending business is the worst because the locations have always been "a problem."  Gov. Exh. 7B.  Conley's statements make clear that he knew he was committing fraud, just as he had done many times in the past.

## II. The Plea Agreement

On October 22, 2015, the defendant pleaded guilty pursuant to a plea agreement (the "Plea Agreement").[3]  As set

---

[3] Before pleading guilty, in April 2015, Conley participated in a proffer with the Government in an effort to provide substantial assistance.  While the Government found Conley credible, the Government declined to offer Conley a cooperation agreement because he was unable to provide information much beyond what

5

forth in the Plea Agreement, the defendant and the Government agreed that the defendant's adjusted offense level is 20 (in light of the November 1, 2015 amendments to the United States Sentencing Guidelines), calculated as follows: a base offense level of seven increased by fourteen levels because the intended loss attributable to the defendant's conduct exceeded $550,000 but was not more than $1,500,000; a two level-increase because the offense involved more than 10 victims and was committed through mass marketing; and a three-level reduction for acceptance of responsibility. Based on an offense level of 20 and a Criminal History Category of IV, the parties agreed that the applicable Guidelines range was 51 to 63 months' imprisonment. The Probation Office agrees with the parties' calculation of the offense level and Guidelines, and recommends a sentence at the high-end of the Guidelines of sixty months' imprisonment. (PSR ¶¶ 5, 46-56 & at 25).

## Argument

### I. A Guidelines Sentence of Imprisonment Is Warranted

A sentence within the Guidelines range of 51 to 63 months' imprisonment is warranted considering the factors set forth in Section 3553(a). In particular, the nature and circumstances of the offense are serious, and a significant

---

was already captured on the recordings and because of his extensive, fraud-based criminal history.

prison sentence is necessary to promote respect for the law, reflect the seriousness of the offense, provide a just sentence, and afford adequate deterrence to others.  See 18 U.S.C. §§ 3553(a)(1), (2)(A), (2)(B).

As this Court has already found at sentencings of co-defendants, the defendant's crime is undoubtedly serious.  In fact, this Court has described the widespread scheme to victimize consumers, some of whom invested their life-savings in what they believed was a unique and profitable business opportunity, as "despicable."  Conley participated in this scheme by knowingly making misrepresentations to prospective customers about the quality of both the product he was selling and, more importantly, the income-producing potential of pre-determined locations which, in fact, did not exist.  In truth, after the customers paid and their machines were delivered, "locators," who were unskilled and unprofessional and who Conley himself described as the "fucking worst," would often take customers around to random locations in an attempt to place their vending machines.  If the machines were placed at all, they almost always were put in ultimately unprofitable locations.  Knowing this to be the case, Conley tried to sell more locations via "master dealer agreements" to the same victims who were doomed to get these unprofitable locations and created false urgency in these victims by telling them there was

7

high demand for these great locations that were in short supply. Conley went further as necessary, peppering his sales pitch with a variety of lies in whatever combination he deemed necessary to make a sale. Conley's lies are numerous and varied, but they are all designed to pressure vulnerable victims – victims who simply wanted to find work in the vending machine business – to part with thousands or tens of thousands of dollars. By way of example, Keith Rexrode, who testified at trial, paid $28,166 for 10 machines that he purchased from Conley. Despite Mr. Rexrode's mechanical expertise, which he demonstrated at trial, the machines broke down repeatedly, and Mr. Rexrode was unable to fix them. Ultimately, after operating his business for about five to six months, Mr. Rexrode recovered about $3,800 from the machines, which came nowhere close to his total investment, including locating, shipping, and other fees, of over $34,600. Tr_731, 740-41, 767, 776-77.

As Mr. Rexrode's story demonstrates, Conley's sales pitch was successful, and, as a result, his crime was significant. The defendant is himself responsible for $1,337,942.50 in intended losses, an amount he has agreed is the appropriate amount of restitution under his plea agreement. The defendant himself fraudulently obtained $160,553.10 in commissions from those intended losses. The defendant has further agreed to forfeiture of these ill-gotten gains.

8

In support of a non-incarceratory sentence, the defendant makes essentially three arguments: (1) he has suffered significant disadvantages throughout his life, including foster care, sexual abuse, depression, and various addictions; (2) he was repeatedly led back to K. Levin's companies for a variety of reasons, including the need to make a living; and (3) he is unlikely to reoffend given his age.  None of these arguments justifies a below-Guidelines sentence.  Even if Conley's arguments are interpreted to suggest that his role was not a serious as that of others in the scheme, the Guidelines calculation already accounts for his role by holding him responsible for only the victims that he dealt with personally and only the loss amount attributed to them.  While the Government is certainly sympathetic to the myriad of struggles that the defendant has faced in his life, those struggles do not excuse his criminal conduct, particularly where he defrauded more than fifty victims who were vulnerable themselves given their level of sophistication with business matters and their often-limited access to financial resources.  Many of those victims faced significant struggles in their own lives, albeit of a different nature than those suffered by the defendant, and were further disadvantaged by the defendant.

While the defendant did repeatedly leave and return to K. Levin's companies, the Court has already found at the

9

sentencing of co-defendant Marcel Harris that that fact is not mitigating, and the Government submits it does not suggest that the defendant should receive a reduced sentence.  Certainly the need for money does not justify stealing from or cheating others.  The defendant made repeated decisions to return to K. Levin's companies when he knew a fraud was being committed, and he must be held accountable for those repeated decisions.

   The defendant's age also does not justify a below-Guidelines sentence.  This is the defendant's sixth conviction.  Even more troubling than this total number is the fact that the defendant is a five-time offender in the fraud crime arena and a three-time offender in the area crimes that involve purportedly legitimate sales jobs.  While in his twenties, the defendant was twice convicted of:  (1) grand larceny for participating in a scheme that made $105,000 from the use of fraudulent social security cards and the submission of false unemployment benefit claims; and (2) false claims in connection with the filing of fraudulent income tax returns.  (PSR ¶¶ 59-62, 65).

   Unlike many criminal defendants, the defendant's crime spree did not stop with age, but instead increased in magnitude.  In his thirties, the defendant was convicted of grand larceny, and served approximately 4 years' imprisonment.  This crime resulted in a loss of approximately $700,000, which the defendant took from a couple for whom the defendant purported to

invest money in gold coins as part of his role as a coin salesman. (PSR ¶¶ 67-73). While on probation for his first coin scheme, and then in his forties, the defendant was convicted of wire fraud and sentenced to 51 months' imprisonment. Again, his crime simply increased in magnitude, this time causing a loss of nearly $1 million when the defendant stole a coin collection from an eighty-year old widow based on false representations he made in his role as a coin salesman. (PSR ¶¶ 77-78).

      The instant case is yet another instance in a troubling pattern of escalating, untempered fraud committed by the defendant. While on supervised release for his wire fraud conviction, and then in his fifties, the defendant went to work for K. Levin. This time his conduct caused more than fifty innocent victims to lose a total of more than $1.3 million. And, perhaps more troubling, this time the defendant engaged in his criminal conduct when he was clean and sober and when he had a social safety net, namely, his 10-year-long relationship with his fiancée, which began in approximately 2006. (PSR ¶¶ 93-94, 104). That the defendant has aged an additional five years since he committed this offense does not suggest that he is any less likely to commit fraud than he was in the prior three decades of his life.

The defendant has committed fraud for decades and has been undeterred by sentences of incarceration as long as 51 months. While Conley did accept responsibility for this crime relatively early, his history of repeated fraud violations and subsequent guilty pleas suggests that this acceptance does not indicate a lack of propensity to reoffend. Given these facts and the nature and circumstances of the offense, and even considering Conley's personal circumstances, a Guidelines sentence is necessary to reflect the seriousness of the crime, to provide just punishment, and to deter those who, like the defendant, seek to defraud innocent consumers.

A Guidelines sentence is also necessary to avoid unwarranted sentencing disparities. Defendant Marcel Harris received a sentence of 70 months' imprisonment for conduct that resulted in a total loss of over $1.6 million and a profit to Mr. Harris of approximately $200,000. (Doc. 330). Although Mr. Harris's Guidelines Range was increased a result of his role as a manager in the scheme, Conley's overall conduct in the scheme was just as egregious as Mr. Harris's, and Conley has a more significant criminal history, and the two should therefore receive similar sentences.

## Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a Guidelines sentence of

imprisonment in this case.  The Government further requests that the Court enter the Consent Order of Forfeiture referenced in the plea agreement, a copy of which the Government will provide for signature at sentencing, and that the Court also order restitution of $160,553.10, to be joint and several with all convicted co-defendants in this case.

Dated:   New York, New York
         March 2, 2016

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                       By: /s/ Jennifer L. Beidel
                              Janis M. Echenberg
                              Jennifer L. Beidel
                              Assistant United States Attorneys
                              (914) 993-1959

cc:   Royce Russell, Esq.